IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 4, 2024

**IN RE NICHOLAI L. ET AL.**

**Appeal from the Juvenile Court for Davidson County**
**No. PT274356          Sheila Calloway, Judge**
_____

**No. M2023-01796-COA-R3-PT**
_____

A putative father appeals the termination of his parental rights to a child. The juvenile court found clear and convincing evidence of several statutory grounds for termination. It also determined that termination was in the child's best interest. Following thorough review, we conclude that not all grounds for termination were supported by clear and convincing evidence. Still, we affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, William R.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

In November 2019, the Department of Children's Services removed two-year-old Seriah L. (the "Child") from the home of her mother ("Mother"). Upon DCS's petition filed in juvenile court, Mother agreed that, due to her "ongoing mental health issues," the Child was dependent and neglected. *See* Tenn. Code Ann. § 37-1-102(b)(13)(B) (Supp. 2022) (defining a "dependent and neglected child" as a child whose parent is "unfit to properly care for . . . [the] child" because of mental incapacity). The subsequent agreed

order finding dependency and neglect noted the Child's alleged father, William R. ("Father"), was "reportedly incarcerated in Kentucky," but his exact whereabouts were unknown. So the Child remained in the legal custody of DCS.

In May 2020, Mother informed DCS that Father was out of jail and wanted to visit the Child. DCS contacted Father at the number provided by Mother, but Father said he would have to call DCS back. He never did. And, by the following year, he was back in jail.

In early October 2021, having already spent nearly five months in jail, Father pleaded guilty to burglary. The criminal court sentenced Father to eight years' confinement, suspended immediately to eight years of supervised probation.

The following month, Father was arrested and later charged with sixteen counts of possession of methamphetamine with the intent to manufacture, sell, or deliver. After serving over six months in jail, in May 2022, Father pleaded guilty to four of the counts. The criminal court again sentenced him to eight years' confinement, suspended immediately to eight years of supervised probation. Later that same month, Mother passed away.

In September 2022, Father violated the terms of his probation. So the court revoked his probation and ordered him to serve the remainder of his sentence with a rehabilitation component. He returned to jail on December 30, 2022.

B.

On January 23, 2023, DCS petitioned to terminate parental rights to the Child.[1] The Child's birth certificate listed no father, and a search of the putative father registry confirmed that no one had formally claimed paternity. The petition named Father as the alleged father of the Child. Father, who remained incarcerated, acknowledged receipt of the petition and was appointed counsel.

As grounds for termination of Father's rights, the petition alleged abandonment by an incarcerated parent by failure to visit and to support and by wanton disregard. And Father allegedly failed to manifest an ability and willingness to assume custody or financial responsibility of the child. The petition also alleged several grounds applicable to putative fathers.

---

[1] DCS also sought to terminate the parental rights of the alleged father of an older child of Mother, Nicholai L. The parental rights of the putative father of Nicholai L. are not at issue in this appeal.

2

At trial, the juvenile court heard from Father, who testified by telephone, and a representative of DCS. The court also heard testimony from the foster mother of the Child ("Foster Mother").

According to Father, he was in a relationship with Mother when the Child was born and knew that he might be the Child's biological father. Father lived with Mother and the Child for "a couple years" after her birth but had "split up with" Mother by the time DCS removed the Child in 2019.

Father acknowledged that he "knew that [the Child] was in DCS custody" because Mother had told him so. Yet he did not seek to establish paternity or to seek custody because he thought Mother "had it under control."

Father also acknowledged that he had been in jail "a lot" after the Child's removal, including stints for his burglary and drug-related convictions. Since the filing of the petition to terminate his parental rights, Father had been furloughed to attend a long-term residential alcohol and drug treatment program. But after he was involuntarily discharged from that program, he failed to report back to jail in accordance with the conditions of the furlough. So the criminal court ordered Father to resume serving his sentence.

Father explained he never visited the Child even when not in jail because "[t]he mother wouldn't let me." Being "on the run" from outstanding warrants also hindered visitation. But he claimed that he supported the Child by giving "the mama money"; he trusted that Mother "was going to take care of" getting the money to the Child.

Father conceded that, given his present circumstances, he was in no position to take custody of the Child. And he did not know if the Child would remember him or if he would recognize the Child if he ever saw her again. Still Father claimed that he would soon be eligible for parole. And once on parole, he intended to seek alcohol and drug treatment. Father had been a methamphetamine user for "probably ten years," but he was "clean now though."

Foster Mother testified that she had cared for the Child and the Child's half-brother, Nicholai L. ("Brother"), since January 2020. At the time of trial, the Child was six, and Brother was 13 years old. Over their almost four years together, they had become "a family" with "established routines and memories."

Although the Child had trouble sleeping when she first came into Foster Mother's care and had been diagnosed with attention-deficit/hyperactivity disorder, Foster Mother described the Child as now doing well. Foster Mother had enrolled her in kindergarten, and the Child loved school. The Child received some services, and Foster Mother was committed to "seek[ing] services for her and mak[ing] sure that she's set up for success both at home and at school or wherever."

3

Both the Child and Brother called Foster Mother "Mom," and she hoped to adopt them if the juvenile court terminated parental rights. Foster Mother believed it would be devastating for the Child to be placed anywhere other than her home, especially given the close relationship between the Child and Brother.

At the conclusion of the hearing, the court terminated Father's rights to the Child. It concluded that there was clear and convincing evidence for each of the statutory grounds alleged for terminating Father's rights. It also concluded that there was clear and convincing evidence that termination of Father's rights was in the Child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of their child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). While this right is fundamental, it is not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2022); *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004).

Tennessee Code Annotated § 36-1-113 specifies both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must prove the existence of at least one statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)(1). If they do so, they then must prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546). "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

In parental termination cases, appellate courts review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). The appellate court "then make[s] its own determination regarding whether the facts, either as found by the trial court or as supported

by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. Whether "the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

A.

On appeal, Father challenges the grounds for terminating his parental rights and the best interest determination. For its part, DCS does not defend the ground of abandonment by an incarcerated parent for failure to support during the four-month period immediately preceding incarceration. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*a*) (Supp. 2022). Nor does it defend the ground of failure of a putative father to make reasonable and consistent payments for the support of the child. *See id.* § 36-1-113(g)(9)(A)(i). Because we agree that neither of the conceded grounds were supported by clear and convincing evidence, we consider only the remaining grounds relied on by the court for terminating Father's parental rights.

## 1. Abandonment by Incarcerated Parent

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." *Id.* § 36-1-113(g)(1). "Abandonment" is statutorily defined. *See id.* § 36-1-102(1)(A). Among other ways, a parent may be deemed to have abandoned his child when he is incarcerated or has been incarcerated within the four-month period preceding the filing of the petition to terminate and one or more conditions have been satisfied. *See id.* § 36-1-102(1)(A)(iv); *see also In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005) (recognizing that "the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct"). Specifically, abandonment occurs when:

> (iv) A parent . . . is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, or a parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> (*a*) Failed to visit . . . for four (4) consecutive months immediately preceding the parent's . . . incarceration; [or]
>
> . . .

5

(*c*) With knowledge of the existence of the . . . child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*a*), (*c*).

Here, the juvenile court concluded that Father abandoned the Child by failing to visit for four consecutive months immediately preceding his incarceration and by exhibiting wanton disregard for the Child's welfare before incarceration. Father was incarcerated from December 30, 2022, through the date of the filing of the petition to terminate parental rights. And there was no dispute that Father failed to visit during the four-month period preceding his incarceration. There was also no dispute that Father had been in and out of jail for much of the time the Child was in DCS custody.

Father argues that his failure to visit should be excused because he was incarcerated during much of the time that the Child was in DCS custody and DCS allegedly made no effort to contact him until after the petition to terminate parental rights was filed. But the proof showed DCS did contact Father a few months after the Child was taken into custody. And DCS made efforts to locate Father after he failed to call back as promised. Even so, reasonable efforts to reunite a family are relevant to the best interest analysis, not the grounds for termination. *In re Kaliyah S.*, 455 S.W.3d at 555. To the extent Father faults DCS for not explaining the potential consequences of his failure to visit when it first contacted him, our supreme court has rejected that argument. *See In re M.L.P.*, 281 S.W.3d at 392. Even putative "parents should know that they have a responsibility to visit their children." *Id.*; *see also* Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii).

As for the conclusion that he engaged in conduct exhibiting a wanton disregard for the welfare of the Child, Father "acknowledges that he has been in jail much of the time [the Child] has been in foster care." Still, he points to his expectation of parole, "which would allow him the opportunity to develop a relationship with [the Child]." But the possibility of parole in the future has no bearing on whether Father's "conduct prior to, during, or after incarceration . . . exhibit[ed] a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(*c*).

Clear and convincing evidence supports both grounds for abandonment. Father failed to visit the Child during the four months preceding his incarceration on December 30, 2022. And he engaged in conduct before his incarceration that exhibited a wanton disregard for the welfare of the Child. This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of the child." *In re Audrey S.*, 182

S.W.3d at 867-68.  The evidence shows that Father was repeatedly incarcerated, engaged in criminal behavior, and abused drugs after the birth of the Child.

2. Failure to Manifest an Ability and Willingness to Assume Custody

Under Tennessee Code Annotated § 36-1-113(g)(14), a parent's rights may be terminated if he "[1] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child, and [2] placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).  Both the failure-to-manifest and the substantial-harm prongs of the ground must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Father contends that DCS failed to prove the failure-to-manifest prong by clear and convincing evidence.  This prong requires proof that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility for the child." *Id*. at 677.  Father submits that he "manifested a willingness for [the Child] to be placed in his custody.  He testified that, if paroled, he had a home where he could live with the Child and a job such that he could support the Child.

Despite this testimony, the evidence clearly and convincingly supports the conclusion that Father failed to manifest a willingness to assume custody of or financial responsibility for the Child.  When evaluating willingness, words alone are insufficient. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018).  Parents demonstrate willingness by taking action to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child. *See In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *18 (Tenn. Ct. App. May 8, 2018) (focusing on the mother's lack of effort to remove the threat of domestic violence); *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (focusing on the mother's lack of effort to fulfill her responsibilities in the parenting plan).  DCS showed that Father had done little to overcome the obstacles he faced.  Even after the petition to terminate was filed, Father sabotaged a chance to get help for his drug use.  And until the trial, he had made no effort to see the Child.

The evidence is equally clear and convincing that placing the child in Father's custody would pose a significant risk of substantial psychological harm.  Foster Mother testified to the harm that the Child would suffer if separated from Brother and the only family she has known for the last four years.  And this Court has acknowledged returning a child to a "virtual stranger" after the child had developed a strong bond with a caregiver constitutes substantial harm. *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020).  Father last saw the Child when she was two years old.  And he admitted that he might not even recognize the Child.

7

3. Status as a Putative Father

Another ground for termination of parental rights specifically addresses "putative fathers." *See* Tenn. Code Ann. § 36-1-113(g)(9)(A). For purposes of the parental termination statute, a "putative father" is "a biological or alleged biological father of a child" who does not qualify as a legal parent and whose parentage has not been excluded by DNA testing, but only if he meets one of several criteria. *See id.* § 36-1-102(44). Here, Father satisfied the criteria by claiming to be the Child's biological father. *See id.* § 36-1-117(c)(2) (Supp. 2022). Father does not dispute his putative father status.

A person who is a putative father may be subject to having his parental rights terminated for one or more of the following reasons:

(i) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department . . . ;

(ii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation . . . ;

(iii) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(iv) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(v) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity . . . or after making a claim of paternity . . . .

*Id.* § 36-1-113(g)(9)(A). The juvenile court concluded that all the statutory reasons applied. We have determined, and DCS concedes, that there was not clear and convincing evidence of a failure "to make reasonable and consistent payments for the support of the child." *See id.* § 36-1-113(g)(9)(A)(i).

After a de novo review of the record, we conclude there is clear and convincing evidence of each of the remaining reasons for terminating a putative father's parental rights. During periods when he was not incarcerated, Father failed to seek reasonable visitation with the Child. *See id.* § 36-1-113(g)(9)(A)(ii). He did not manifest an ability or a willingness to assume legal and physical custody of the Child. *See id.* § 36-1-113(g)(9)(A)(iii). And, given that Father and the Child were strangers to each other,

8

placing the Child in Father's legal and physical custody would pose a risk of substantial harm to the psychological welfare of the Child. *See id.* § 36-1-113(g)(9)(A)(iv).

Father also "failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity." *See id.* § 36-1-113(g)(9)(A)(v). Father testified that he was in a relationship with Mother when the child was born, lived with Mother and the Child for "a couple years" after her birth, and believed he was her biological father. Yet Father never petitioned to establish paternity.

Father claimed that he did not act to establish paternity because he "never thought [he] could" and "didn't know how." On appeal, he notes that "he had little or no contact with DCS while [the Child] was in foster care." But this ground for termination does not "require that DCS exert reasonable efforts to assist Father in establishing himself as a legal parent." *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *8 (Tenn. Ct. App. June 6, 2017); *see, e.g., In re Samone D.*, No. W2021-01225-COA-R3-PT, 2023 WL 1962016, at *14 (Tenn. Ct. App. Feb. 13, 2023) (rejecting putative father's argument that DCS's failure to assist him excused his failure to file a petition); *In re Jase P.*, No. E2016-02519-COA-R3-PT, 2017 WL 2672781, at *9 (Tenn. Ct. App. June 21, 2017) (rejecting argument that "DCS could establish Father's paternity more readily than Father").

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So, after a ground for termination has been proven, courts conduct an analysis to determine the child's best interest using a list of twenty "child-centered" factors. Tenn. Code Ann. § 36-1-113(i) (Supp. 2022). The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017).

The analysis focuses on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. It evaluates "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

Here, the court found that Father had not shown any continuity, stability, or effort to meet the Child's needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C), (O). He did not visit the Child while she was in DCS custody. *See id*. § 36-1-113(i)(1)(E). Father was a virtual

stranger to the Child. There was no secure and healthy parental attachment between Father and the Child. *See id*. § 36-1-113(i)(1)(D). And the court did not believe that there was a reasonable expectation that Father could create such a relationship in the future. *See id.*

The court also found that Father took no action to establish paternity, to seek custody of the Child, or to address his drug addiction and criminal activity. *See id.* § 36-1-113(i)(1)(M). Father was in jail and had been involuntarily discharged from the only substance abuse program he attended during his current period of incarceration. *See id.* § 36-1-113(i)(1)(K).

Since he ended his relationship with Mother, Father had never provided safe or stable care for the Child. *See id.* § 36-1-113(i)(1)(O). Father "admitted that he chose not to be involved in the reunification process even though he knew [the Child] was in custody" and instead left the matter to Mother to handle. He did not demonstrate an understanding of the basic needs of the Child or an ability to create and maintain a home for the Child. *See id.* § 36-1-113(i)(1)(P), (Q).

Meanwhile, the Child had established a close and healthy relationship with Foster Mother, who wanted to adopt her. *See id.* § 36-1-113(i)(1)(H), (I). In the foster home, she was "loved and thriving." Brother was also in the home, and the Child had strong attachments to Brother, Foster Mother, and Foster Mother's family. *See id.* The foster home offered the Child stability and continuity "expeditiously." *See id.* § 36-1-113(i)(1)(A).

The court found that a change in caretakers and physical environment would likely have a negative effect on the Child's emotional, psychological, and medical condition. *See id.* § 36-1-113(i)(1)(B). And removal from her home of nearly four years would be devastating.

We conclude that the evidence does not preponderate against the court's findings. And the combined weight of the proven facts amounted to clear and convincing evidence that termination was in the Child's best interest.

## III.

We affirm the termination of Father's parental rights. The record contains clear and convincing evidence to support more than one statutory ground for termination. We also conclude that terminating Father's parental rights was in the child's best interest.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE

10